**CAPITAL CASE**
UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| BRENDA EVERS ANDREW | ) | Case No. 15-6190 |
| | ) | |
| Petitioner-Appellant, | ) | W. District of Oklahoma |
| | ) | D. Ct. No. 08-cv-00832-R |
| v. | ) | |
| | ) | |
| SCOTT TINSLEY, Warden | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |
| _____ | ) | |

————————————

**PETITION FOR PANEL REHEARING AND
REHEARING *EN BANC***

————————————

John T. Carlson
LANDY LEEDY MCGREEVY WINOCUR
303 Sixteenth Street, Suite 200
Denver, CO 80202
carlson@lmwlaw.com

John R. Mills
Nathalie Greenfield
Jessica Sutton
Sarah Wishingrad
PHILLIPS BLACK, INC.
1721 Broadway, Suite 201
Oakland, CA 94612
j.mills@phillipsblack.org

**TABLE OF CONTENTS**

Table of Authorities .................................................................................................. ii

I.      Rule 40 Statement ........................................................................................ 1

II.     Statement of the Case ................................................................................... 2

III.    Argument ...................................................................................................... 3

        a.  Rehearing or Rehearing *En Banc* Is Required to Effectuate the
            Supreme Court's Remand Instructions .......................................... 3

                i.  The Panel Failed to Consider the Disputed Evidence ..................... 5

                ii.  The Panel Did Not Analyze the Impact of
                     the Disputed Evidence .................................................................. 8

                iii.  The Panel Failed to Adequately Address the Missing
                      Limiting Instruction ..................................................................... 10

        b.  Rehearing or Rehearing *En Banc* Is Required to Correct the Panel's
            Prejudice Analysis ....................................................................... 11

                i.  The Panel Misinterpreted *Buck v. Davis* ...................................... 11

                ii.  The Panel Ignored *Kyles v. Whitley* to Avoid Addressing
                     Cumulative Error ........................................................................ 14

        c.  The *En Banc* Court Should Limit or Overrule *Wellmon v. CDOC* ........... 17

IV.     Conclusion .................................................................................................. 18

Certificate of Compliance ...................................................................................... 20

Certificate of Service ............................................................................................. 21

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Andrew v. State*,
  164 P.3d 176 (Okla. Crim. App. 2007) ...............................................................passim

*Andrew v. Tinsley*,
  164 F.4th 789 (10th Cir. 2026)............................................................................passim

*Andrew v. White*,
  62 F.4th 1299 (10th Cir. 2023)...............................................................2, 8, 9, 10, 12

*Andrew v. White*,
  604 U.S. 86 (2025) .............................................................................................passim

*Buck v. Davis*,
  580 U.S. 100 (2017) .......................................................................................1, 11, 13, 14

*Cargle v. Mullin*,
  317 F.3d 1196 (10th Cir. 2003)...............................................................................16, 17

*Darden v. Wainwright*,
  477 U.S. 168 (1986) .....................................................................................................5

*Davis v. Ayala*,
  576 U.S. 257 (2015) ...................................................................................................13

*Davis v. Kelley*,
  855 F.3d 833 (8th Cir. 2017)......................................................................................14

*DeRosa v. State*,
  89 P.3d 1124 (Okla. Crim. App. 2004) ......................................................................5

*Fairchild v. Workman*,
  579 F.3d 1134 (10th Cir. 2009)..............................................................................7, 18

*Frontiero v. Richardson*,
  411 U.S. 677 (1973) ...................................................................................................14

*Gardner v. Galetke*,
  568 F.3d 862 (10th Cir. 2009)......................................................................................7

*Glossip v. Oklahoma*,
  604 U.S. 226 (2025) ...................................................................................................16

*Greenlaw v. United States*
  554 U.S. 237 (2008) ...................................................................................................16

*Jones v. Bradshaw*,
  46 F.4th 459 (6th Cir. 2022).......................................................................................14

*Kyles v. Whitley*,
  514 U.S. 419 (1995) ......................................................................................1, 8, 11, 16

*Mayle v. Felix*,
  545 U.S. 644 (2005) ...................................................................................................18

*Nichols v. Sullivan*,
  867 F. 2d 1250 (10th Cir. 1989)...................................................................................7

ii

*Payne v. Tennessee*,
501 U.S. 808 (1991) ...................................................................................................10
*Penry v. Lynaugh*,
492 U.S. 302 (1989) ...................................................................................................12
*Romano v. State*,
909 P.2d 92 (Okla. Crim. App. 1995) ........................................................................16
*Rompilla v. Beard*,
545 U.S. 374 (2005) .....................................................................................................9
*Rose v. Mitchell*,
443 U.S. 545 (1979) ...................................................................................................13
*United States v. Cortez-Nieto*,
43 F.4th 1034 (10th Cir. 2022)...................................................................................15
*United States v. Rivera*,
900 F.2d 1462 (10th Cir. 1990)..................................................................................16
*Wellmon v. CDOC*,
952 F.3d 1242 (10th Cir. 2020).......................................................................1, 17, 18
*Wiggins v. Smith*,
539 U.S. 510 (2003) .....................................................................................................9
*Williams v. Taylor*,
529 U.S. 362 (2000) .....................................................................................................9

**Statutes**

12 Okla. Stat. Ann. § 2404 .............................................................................................10
28 U.S.C. § 2254(d)........................................................................................................18

**Other Authorities**

Valerie P. Hans, *How Juries Decide Death: The Contributions of the Capital Jury Project*, 70 IND. L.J. 1233 (1995)................................................................................12

## I.    RULE 40 STATEMENT

Brenda Andrew again seeks relief in light of the pervasive gender bias that rendered her life-or-death proceedings fundamentally unfair. For the second time, the panel's overly parsimonious adjudication of the due process violation at the heart of her capital trial violates Supreme Court jurisprudence—including the very decision remanding this case.

The panel misapplied three Supreme Court cases. First, the panel disregarded the Supreme Court's remand instructions in *Andrew v. White* by ignoring the breadth and impact of sex-stereotyping evidence in Ms. Andrew's trial. 604 U.S. 86 (2025) (per curiam) ("*Andrew III*"). Second, the panel limited *Buck v. Davis* to its facts, betraying the constitutionally protected principle that the law must "punish[] people for what they do, not who they are." 580 U.S. 100, 123 (2017). Third, the panel refused to consider the cumulative impact of errors across the entire record, contravening *Kyles v. Whitley*, 514 U.S. 419 (1995).

The panel decision also reveals the necessity of overruling or limiting *Wellmon v. CDOC*, 952 F.3d 1242 (10th Cir. 2020). Relying on *Wellmon*, the panel refused to consider material that was part of the exhausted claim and arguments before the Oklahoma Court of Criminal Appeals (OCCA), but was not, in its view, pled precisely enough there. *Wellmon*'s holding, however, is irreconcilable with how courts assess both claim exhaustion and fundamental fairness.

As a result, the panel failed to properly assess how "the erroneous admission of prejudicial evidence ... violate[d] due process" in Ms. Andrew's trial. *Andrew III*, 604 U.S. at 87–88. Rehearing or rehearing *en banc* is required.

1

## II.    STATEMENT OF THE CASE

Brenda Andrew is convicted of killing her husband, Robert Andrew. During the incident, Ms. Andrew was shot in the arm. Ms. Andrew maintains her innocence, and James Pavatt, her co-defendant and former intimate partner, confessed to committing the crime without Ms. Andrew's involvement.

The State's case was saturated with evidence and argument grounded in sex-based stereotypes, appealing to the jury to condemn Ms. Andrew for her perceived failures as a woman. The trial court refused to give a limiting jury instruction on such evidence, Tr. 3835–36, admitted Ms. Andrew's un-*Mirandized* custodial statements, Tr. 2282–99, and refused to admit the testimony of over half of the defense's witnesses. Tr. 3369–95, 3768–90.

On direct appeal, the OCCA affirmed over two dissents. *Andrew v. State*, 164 P.3d 176 (Okla. Crim. App. 2007) ("*Andrew I*"). Judge Chapel would have granted a new trial, and Judge Johnson would have granted resentencing due to the sex-stereotyping evidence. *See id.* at 208 (Chapel, J., dissenting); *id.* at 206–08 (Johnson, J., dissenting in part).

The District Court denied Ms. Andrew habeas relief. A split panel of this Court affirmed, finding no clearly established federal law that the admission of unduly prejudicial evidence could violate due process. *Andrew v. White*, 62 F.4th 1299 (10th Cir. 2023) ("*Andrew II*"). Judge Bacharach dissented and would have granted Ms. Andrew both guilt- and penalty-phase relief. *Id.* at 1365.

The Supreme Court subsequently remanded the case for consideration of whether

2

the OCCA's decision violated clearly established federal law prohibiting the introduction of evidence so "unduly prejudicial" as to render Ms. Andrew's trial "fundamentally unfair." *Andrew III*, 604 U.S. at 96. On remand, the panel denied relief. App. 32. This petition follows.

### III.    ARGUMENT

The Supreme Court remanded Ms. Andrew's case to the panel to determine "whether a fairminded jurist [reviewing the trial record] could disagree that the evidence so infected the trial with unfairness as to render the resulting conviction or sentence a denial of due process." *Andrew III*, 604 U.S. at 96 (cleaned up). No fairminded jurist, reviewing the whole trial record, could conclude that either the guilt or penalty proceedings were fair. The panel was only able to reach a contrary conclusion by distorting its prejudice analysis.

#### a.    Rehearing or Rehearing *En Banc* Is Required to Effectuate the Supreme Court's Remand Instructions

During Ms. Andrew's trial, "[t]he State spent significant time ... introducing evidence about Andrew's sex life and about her failings as a mother and wife." *Id.* at 87. The State "elicited testimony about Andrew's sexual partners reaching back two decades," questioned its witnesses "about how often she had sex in her car," and probed into whether "she had 'come on to' another witness's sons." *Id.* at 88–90; *see Andrew I*, 164 P.3d at 190–92; Brief of Appellant at 29–30, 38–42, *Andrew v. Oklahoma*, 164 P.3d 176 (Okla. Crim. App., 2007) (No. D-2004-1010) ("OCCA Br."). Prosecutors produced testimony "about the outfits she wore to dinner or during grocery runs," including testimony that she "had dressed provocatively at a restaurant." *Andrew III*, 604 U.S. at 88, 90; *see Andrew I*,

3

164 P.3d at 192; OCCA Br. at 40–42. Indeed, "[a]t least two of the prosecution's guilt-phase witnesses took the stand exclusively to testify about Andrew's provocative clothing." *Andrew III*, 604 U.S. at 88; *see Andrew I*, 164 P.3d at 192; OCCA Br. at 40–42. Yet more witnesses "were asked to comment on whether a good mother would dress or behave the way Andrew had." *Andrew III*, 604 U.S. at 88; *see Andrew I*, 164 P.3d at 190; OCCA Br. at 40–42, 62–65. Prosecutors even introduced testimony about "the underwear she packed for vacation." *Andrew III*, 604 U.S. at 88; *see Andrew I*, 164 P.3d at 194; OCCA Br. at 66–67.

The sex-based stereotyping continued into the State's arguments at both guilt and penalty phases, as the Supreme Court explained:

> In its closing statement, the prosecution again invoked these themes, including by displaying Andrew's "thong underwear" to the jury, by reminding the jury of Andrew's alleged affairs during college, and by emphasizing that Andrew "had sex on [her husband] over and over and over" while "keeping a boyfriend on the side." At both the guilt and sentencing phases, prosecutors contrasted Andrew with the victim, whom they asserted had been "committed to God."

*Andrew III*, 604 U.S. at 88–89 (citations omitted)

On remand, the panel had clear guidance: "Specifically, the question now is whether a fairminded jurist reviewing *this record* could *disagree* with Andrew that the trial court's mistaken admission of irrelevant evidence was so 'unduly prejudicial' as to render her trial 'fundamentally unfair.'" *Andrew III*, 604 U.S. at 96 (emphasis added) (citation omitted). The panel had to address whether there could be fairminded disagreement with Ms. Andrew in reading "this record" with respect to guilt and sentencing phases. *Id.* Further, the Court tasked the panel with considering "the relevance of *the disputed evidence* to the

charges or sentencing factors, the degree of prejudice Andrew suffered from its introduction, and whether the trial court provided any mitigating instructions." *Id.* (emphasis added).

The panel, however, declined to look at "the disputed evidence" in "this record." *Id.* In doing so, it disregarded weeks of prejudicial testimony that influenced jurors' perceptions of Ms. Andrew's credibility, her defense, and, ultimately, the value of her life. This approach failed to effectuate both the text and meaning of the remand instructions.

### i.  The Panel Failed to Consider the Disputed Evidence

First, the panel failed to consider the record before it—a record that was before the OCCA in its entirety and to which Ms. Andrew referred liberally in her OCCA briefing. The remand instructions and the body of jurisprudence on which the Supreme Court relied throughout its opinion—jurisprudence that the OCCA purported to apply at the time of Ms. Andrew's appeal—underscore that an assessment of the whole record is axiomatic to the fundamental fairness inquiry. *See, e.g.*, *Darden v. Wainwright*, 477 U.S. 168, 178–183 (1986) (assessing the impact of improper closing argument within the context of the whole trial); *DeRosa v. State*, 89 P.3d 1124, 1144 (Okla. Ct. App. 2004).

Indeed, the Supreme Court referred to specific facts from the record that the panel declined to consider. For example, the Court discussed Ms. Andrew's "alleged affairs during college" and her "sexual partners reaching back two decades[.]" *Andrew III*, 604 U.S. at 88–89. Yet the panel listed "Ms. Andrew's relationship with another man in college" as an example of evidence it would not consider. App. 15. Similarly, the Court instructed the panel to assess the trial prosecutor's use of the slur "slut." *Andrew III*, 604

U.S. at 89 n.1 ("Whether the prosecution quoted something it believed Andrew once said to suggest to the jury that Andrew herself was a 'slut puppy,' or simply to recite an alleged abusive phone call, is a question of fact for the Tenth Circuit to resolve."). Yet the panel listed the State's "characterization of [Ms. Andrew] as a 'slut puppy'" as still more evidence it refused to consider. App. 15.

Instead, the panel reduced its assessment of the guilt phase to "ten testimonial passages" because, it claimed, these were the only "arguments" before the OCCA.[1] App. 14–15. Similarly, in its penalty phase analysis, the panel failed to address the month of stereotyping evidence from the guilt phase that the state incorporated at sentencing. *See id.* 29–31. In so doing, the panel sidestepped the remand instructions and confused "arguments" for facts.

Ms. Andrew's due process *claim* is exhausted. OCCA Br. at 42, 48, 69, 99. Her *argument* before the OCCA and in the two decades since has consistently been that sex-stereotyping evidence rendered her trial fundamentally unfair.[2] *See id.* at 38–40 (arguing that "[t]he State presented this evidence only to show that Brenda Andrew was a bad person because she had affairs"); 40–42 (arguing that sex shaming evidence was "pure bad character evidence intended to humiliate and dehumanize Brenda Andrew and to reduce

---

[1] The panel does, paradoxically, appreciate the requirement that it consider the whole record—but only with respect to evaluating "evidence of guilt." App. 27. Such a one-sided approach does not find support in the remand instructions or jurisprudence, nor did the Warden advocate for it.

[2] Indeed, Judge Arlene Johnson's dissent from the OCCA's opinion explicitly recognized that Ms. Andrew's argument was about the impact of sex-stereotyping evidence. *See Andrew I*, 164 P.3d at 206.

her to a venal caricature in the eyes of the jury"); 96–97 (arguing that prosecutorial argument about her parenting and sexual behavior represented "an antiquated belief about the 'appropriate behavior' of women [which] was an inflammatory, derogatory, and prejudicial attack"). And Ms. Andrew has relied on broadly the same *facts* for the past two decades in making her due process argument. *See id.* at 29–30; 38–42; 45–48; 62–63; 66–67; 96–97. Her addition of further record citations on remand changes neither the claim nor the argument; it simply presents the court with more examples of sex stereotyping, which, as this Court has acknowledged, she is permitted to do.[3] *See Fairchild v. Workman*, 579 F.3d 1134, 1148 (10th Cir. 2009) ("To be sure, not every new piece of evidence makes a claim a new one."); *Gardner v. Galetke*, 568 F.3d 862, 881 (10th Cir. 2009) (petitioner can bring new evidence in federal court if it "would likely only have added color" to the claim presented in state court); *cf. Nichols v. Sullivan*, 867 F. 2d 1250, 1252 (10th Cir. 1989) (habeas petitioner not required to "invoke talismanic language" because exhaustion is satisfied once the "substance" of a claim is presented in state court).

Moreover, the panel's "ten testimonial passages" excluded evidence considered by the OCCA. For example, the panel erroneously determined that the OCCA did not consider Ms. Andrew's "blank demeanor when questioned at the police station" or "Ms. Andrew's attractiveness." App. 15. But Ms. Andrew asked the OCCA to find that police testimony about her demeanor rendered her trial unfair, and the OCCA ruled on that claim. *See* OCCA

---

[3] The panel expected Ms. Andrew to reference every single instance of sex-based stereotyping in her briefing to the OCCA. In a trial so saturated with such evidence, raising an exhaustive list of examples would render coherent briefing impossible.

Br. at 45–48 (briefing the due process violation); *Andrew I*, 164 P.3d at 196 (OCCA discussion of officers' demeanor testimony). She also argued before the OCCA that the extensive evidence about her perceived "attractiveness" throughout trial rendered her proceedings unfair, and the OCCA determined that some of this sexualizing testimony was irrelevant. *See* OCCA Br. at 40–41 (briefing about Ms. Andrew's appearance); *Andrew I*, 164 P.3d at 192 (OCCA discussion of Ms. Andrew's appearance). In any event, the panel's decision to restrict its fundamental fairness analysis to a limited set of record citations was unjustified under the law of this Circuit and the Supreme Court.

### ii. The Panel Did Not Analyze the Impact of the Disputed Evidence

Second, the panel did not grapple with the impact of the constant sex-stereotyping throughout trial. Impact-driven fundamental fairness analysis differs from an assessment of the sufficiency of the evidence. *See Kyles*, 514 U.S. at 434–35; *Andrew II*, 62 F.4th at 1365 (Bacharach, J., dissenting) ("[T]he sufficiency of the evidence doesn't mean that the trial was fair or the errors harmless."). Yet the panel's analysis approximated a sufficiency test, assessing at both phases whether there was evidence on the record to sustain a conviction or death sentence. App. 20–23 (reasoning that there were "24 other pieces of evidence" of guilt and faulting Ms. Andrew for not challenging the "existence or strength of this evidence of guilt"); *id.* at 30 (reasoning, in denying penalty relief, that Ms. Andrew did not "question the strength of the evidentiary support for the aggravator").

The panel failed to contend with *how* the glut of sex-stereotyping evidence affected the jury's assessment of other evidence—which was precisely the issue before it on

8

remand. *Andrew III*, 604 U.S. at 96. Prejudice analysis cannot be reduced to lists of evidence; rather, it asks whether the contested evidence and argument "might well have influenced the jury's appraisal" of a defendant's culpability. *Wiggins v. Smith*, 539 U.S. 510, 538 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 398 (2000)); *see Rompilla v. Beard*, 545 U.S. 374, 393 (2005) ("[A]lthough we suppose it is possible that a jury could have heard [omitted mitigating evidence] and still have decided on the death penalty, that is not the test.").

Had the panel engaged with the evidence, its nature and volume would have compelled but one conclusion—that Ms. Andrew's proceedings were rendered fundamentally unfair by evidence that "portrayed [her] as a scarlet woman, a modern Jezebel, sparking distrust based on her loose morals." *Andrew II*, 62 F.4th at 1366 (Bacharach, J., dissenting). The State's evidence "ha[d] no purpose other than to hammer home that Brenda Andrew is a bad wife, a bad mother, and a bad woman." *Andrew I*, 164 P.3d at 206–07 (Johnson, J., dissenting in part). And the volume of sex-stereotyping evidence tainted Ms. Andrew's trial "from start to finish" with "tales of Ms. Andrew's promiscuity." *Andrew II*, 62 F.4th at 1366 (Bacharach, J., dissenting). Indeed, the State's "drumbeat on Ms. Andrew's sex life," particularly in bookending the trial, "surely left an imprint on the jurors, who generally give great weight to information they learn early in a trial" and had an "outsized effect due to [its] temporal proximity to jury deliberations." *Id.* (citation omitted). This evidence affected jurors' interpretations of the circumstantial "evidence of guilt" on which the panel relies—all of which was zealously contested at trial—by "plucking away any realistic chance that the jury would seriously consider [Ms.

9

Andrew's] version of events." *Id.* And at the penalty phase, the evidence dehumanized Ms. Andrew by "trivializ[ing] the value of her life[.]" *Andrew I*, 164 P.3d at 206–07 (Johnson, J., dissenting).

The implication of the panel's opinion is that the prosecution may infect a trial with unlimited prejudicial evidence—including sex-based slurs and underwear—as long as the list of "evidence of guilt" is long enough. App. 20–23. Such an approach flies in the face of the very premise that the Supreme Court established in *Payne* and reiterated in *Andrew*: that some evidence is so unduly prejudicial that its admission renders a trial fundamentally unfair, even in the face of other evidence supporting a conviction or death sentence. *See Andrew III*, 604 U.S. at 88; *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).

### iii.  The Panel Failed to Adequately Address the Missing Limiting Instruction

Third, the panel did not appreciate how the lack of "mitigating instructions" exacerbated the prejudice from the disputed evidence. *See Andrew III*, 604 U.S. at 96. Having tried in vain to exclude sex-stereotyping evidence, trial counsel requested a standard limiting instruction under state law. *See* 12 Okla. Stat. Ann. § 2404; Tr. 3835–36. The trial court denied the request without explanation, refusing the one instruction that might have constrained the jury's reliance on improper evidence as a basis for conviction and sentence of death. Tr. 3835–36.

On remand, the panel acknowledged that a limiting instruction "might have tempered [this] risk," but it diminished the salience of the missing instruction by determining that the jury had "overwhelming evidence of guilt unrelated to Ms. Andrew's

sexual conduct." App. 27. That analysis misses the point. The Supreme Court recognized that the lack of a limiting instruction heightens the risk of prejudice, and the lack of instruction must be weighed in relation to the prejudicial nature of the evidence at both guilt and penalty. *See Andrew* III, 604 U.S. at 96. To dismiss the significance of the missing limiting instruction because the jury heard evidence of guilt also fails entirely to grapple with the impact of the sexualizing evidence, particularly on the penalty-phase verdict. Without the instruction, jurors were left to absorb the "egregious" torrent of sex-stereotyping evidence "in violation of the fundamental rule that a defendant must be convicted, if at all, of the crime charged and not of being a bad woman." *Andrew I*, 164 P.3d at 206–07 (Johnson, J., dissenting in part). Rehearing is required.

### b. Rehearing or Rehearing *En Banc* Is Required to Correct the Panel's Prejudice Analysis

The panel gutted the Supreme Court's jurisprudence in *Buck v. Davis* and *Kyles v. Whitley*. The panel's cramped view of *Buck* is misguided. Its refusal to consider all the errors in the record violates *Kyles*. And the panel's willingness to find a waiver that the Warden did not assert to constrict its prejudice analysis violates the very party presentation principle the panel invoked.

### i. The Panel Misinterpreted *Buck v. Davis*

The panel denied Ms. Andrew relief because it determined that the unduly prejudicial evidence did not precisely coincide with a "central question" before the jury— a requirement that the panel reads into *Buck v. Davis*. App. 24 (citing 580 U.S. at 121). This conclusion misapprehends the centrality of the sex-stereotyping evidence to both

phases of the case and fundamentally misinterprets *Buck*.[4]

The sex-based stereotyping bore directly on the questions before the jury. At the guilt phase, the State's case was predominantly circumstantial; Ms. Andrew "hotly contested" the evidence of guilt on which the panel relies. *Andrew III*, 604 U.S. at 89 n.1. As such, her credibility and the believability of her defense were essential to each question before the jury. The evidence of her perceived sexual transgressions, clothing and underwear, and unfeminine demeanor were *the* central theme of the trial and eviscerated jurors' ability to "seriously consider her version of events." *Andrew II*, 62 F.4th at 1366 (Bacharach, J., dissenting).

Similarly, at the penalty phase, the panel restricted its review to evidence and argument about two aggravating factors. App. 29–31. This review misunderstands that the "central question" facing jurors in a penalty phase determination is fundamentally whether a defendant should live or die. *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("[T]he sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime") (cleaned up).[5] The panel failed to consider how a month's worth of evidence regarding Ms. Andrew's affairs, appearance, and parenting—evidence not even mentioned in the panel's review of the penalty phase

---

[4] Notwithstanding the prominence of the party presentation rule in the panel opinion, the panel rests its decision on an interpretation of *Buck* that no party advanced.

[5] The panel also overlooks the reality that jurors engage in a holistic inquiry when determining whether to vote for death. *See, e.g.*, Valerie P. Hans, *How Juries Decide Death: The Contributions of the Capital Jury Project*, 70 IND. L.J. 1233, 1236 (1995) ("Deciding death is not something that is easily reduced to an algebraic exercise of weighing aggravating and mitigating circumstances.").

proceedings—affected the assessment of her death-worthiness by "trivializ[ing] the value of her life in the minds of jurors." *Andrew I*, 164 P.3d at 206–07 (Johnson, J., dissenting).

Even so, focusing on centrality asks the wrong question. The panel read *Buck* as imposing a novel condition for relief: that the stereotyping in a trial be directly tied to an element of the crime or an aggravator. App. 24. *Buck* did assess the effect of race-based stereotyping on jurors' evaluation of the defendant's future dangerousness. But crucially, the panel ignored the Supreme Court's reasoning underpinning the holding. *See Buck*, 580 U.S. at 123 ("Buck may have been sentenced to death in part because of his race. ... [T]his is a disturbing departure from a basic premise of our criminal justice system: Our law punishes people for what they do, not who they are. Dispensing punishment on the basis of an immutable characteristic flatly contravenes this guiding principle."); *Andrew III*, 604 U.S. at 94 ("General legal principles can constitute clearly established federal law for purposes of AEDPA so long as they are holdings of this Court.").

The cases on which *Buck* relies further underscore that its holding is not limited to its facts, but rather is grounded in the pernicious effects of stereotype-based decision-making. *See Buck*, 580 U.S. at 124 ("'Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice.' Relying on race to impose a criminal sanction 'poisons public confidence' in the judicial process. It thus injures not just the defendant, but 'the law as an institution, ... the community at large, and ... the democratic ideal reflected in the processes of our courts.'" (quoting *Rose v. Mitchell*, 443 U.S. 545, 555 (1979); *Davis v. Ayala*, 576 U.S. 257, 285 (2015))).

Nor does the panel's blinkered interpretation find support in habeas jurisprudence

from the federal appellate courts, which correctly reads from *Buck* the premise that stereotype-based decision-making is anathema to the fair administration of criminal justice. *See, e.g.*, *Davis v. Kelley*, 855 F.3d 833, 836 (8th Cir. 2017) (per curiam) ("*Buck* focused on the race-based nature of the case and its far reaching impact on the community by the prospect of a defendant having been sentenced to death because of his race."); *Jones v. Bradshaw*, 46 F.4th 459, 488–89 (6th Cir. 2022) (granting relief because the challenged evidence "coincided precisely with a particularly noxious strain of racial prejudice" and it is the racial prejudice "which offends the Constitution on its face"). These courts recognize that stereotype-based evidence is harmful because it encourages jurors to make determinations based on immutable characteristics. *See Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) ("[S]ex, like race . . . is an immutable characteristic."). This toxin "can be deadly in small doses." *Buck*, 580 U.S. at 122. The panel's constricted reading of *Buck*— in a case with pervasive stereotype-based evidence—undercuts the very protections on which the Supreme Court's decision is premised.

### ii. The Panel Ignored *Kyles v. Whitley* to Avoid Addressing Cumulative Error
#### 1. Ms. Andrew Has Not Waived Cumulative Error

The panel unreasonably faults Ms. Andrew for not re-raising a claim related to the cumulative impact of guilt-phase errors during her trial. App. 20 n.4. In her opening brief to this Court, Ms. Andrew raised the constitutional violations posed by the admission of her un-*Mirandized* custodial statements and the trial court's exclusion of core defense

witnesses—exclusions that the OCCA found to be erroneous.[6] *See* Doc. 31 at 69, 92–93, 129. Ms. Andrew asserted the cumulative impact of these errors before this Court and the Supreme Court. *See id.* at 126; Cert. Pet. at 29. On remand, in accordance with both the Supreme Court's and this Court's instructions, Ms. Andrew submitted supplemental briefing addressing the impact of sex-based stereotyping on the fundamental fairness of her trial and how these errors compounded the harm. *See* Doc. 197 at 28. Ms. Andrew did not waive the errors discussed in her opening brief. *See* App. 4 (noting that "the Supreme Court vacated our judgment" but "didn't vacate the majority opinion").

The panel relies on the party presentation rule to avoid engaging with these errors. The party presentation principle, however, functions to prevent courts from introducing arguments that the parties neither introduced nor addressed. *See United States v. Cortez-Nieto*, 43 F.4th 1034, 1052 (10th Cir. 2022) (explaining that the doctrine "restricts courts from *raising* new issues") (emphasis in original). It does not prohibit a court from considering a preserved claim that was not briefed further in a supplemental pleading or from conducting legal analysis essential to the claims at issue. In fact, "[c]ourts have always had authority to resolve raised issues as fairness requires." *Id.* at 1052. The panel's invocation of the party presentation rule was thus mistaken.[7]

---

[6] One excluded witness was a first responder who would have testified that when he arrived, Ms. Andrew was upset and pleading for help—contradicting the State's insistence on Ms. Andrew's blank demeanor. Further, two neighbors would have provided testimony supporting Ms. Andrew's account that the gunshots were fired in rapid succession, undermining the State's argument that she had time to stage her own wound.

[7] The panel's reliance on *Greenlaw v. United States* is similarly misguided, since it concerns the cross-appeal rule, which is not at issue here. *See* 554 U.S. 237, 240 (2008).

**2. The Panel Failed to Review the Impact of Prejudicial Errors Across Ms. Andrew's Trial**

The panel's failure to assess how the prejudice from sex-stereotyping evidence built upon and interacted with other trial errors also contravenes *Kyles*.[8] 514 U.S. at 440 (requiring "an assessment of the cumulative effect of the evidence" to assess prejudice). This Court has previously aggregated prejudice across different types of claims, consistent with *Kyles*. *See Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003) (explaining that "our cases reflect application of cumulative-error review to legally diverse claims"). And this Court assesses prejudice across the entire trial when a defendant alleges a due process violation. *See United States v. Rivera*, 900 F.2d 1462, 1469–70 (10th Cir. 1990) (explaining, as "an extension of the harmless-error rule," that courts assessing prejudice must consider the entire record in order to determine "whether the defendant's substantial rights were affected"); *see also Glossip v. Oklahoma*, 604 U.S. 226, 250–51 (2025) (accumulating state law errors to assess fundamental fairness) (citing *Kyles*, 514 U.S. at 441). The OCCA, at the time it assessed Ms. Andrew's due process violation, likewise was required to "look at the entire record to determine whether the cumulative effect of [prosecutorial error] prejudiced Appellant." *Romano v. State*, 909 P.2d 92, 115 (Okla. Crim. App. 1995).

---

[8] The panel claims Ms. Andrew offered no basis for reviewing on remand how the *Miranda* violation and erroneously excluded witnesses affected the fundamental fairness of her trial. App. 20 n.4. As noted *supra*, these claims are not waived, and moreover, the panel never addressed their underlying merits, so they remain part of record the panel had to review for fundamental fairness. Doc. 197 at 28.

Moreover, this court's precedent dictates that the panel should have assessed penalty phase prejudice by combining errors at both the guilt and penalty phases. *See Cargle*, 317 F.3d at 1208. ("[O]ur consideration of petitioner's claim of error at the penalty phase may be cumulated with guilt-phase error, so long as the prejudicial effect of the latter influenced the jury's determination of sentence.").[9] The *Cargle* court noted that "the chance or degree of carry-over prejudice to the penalty phase may be attenuated," but such attenuation concerns not *whether* guilt-phase errors infected the penalty phase, but by *how much* they did so. 317 F.3d at 1208.

Nevertheless, the panel ignored the cumulative impact of errors across the trial, including the impact of guilt-phase errors on the penalty phase. This limited prejudice analysis was both unnecessary and improper.

### c.   The *En Banc* Court Should Limit or Overrule *Wellmon v. CDOC*

The panel's reliance on *Wellmon v. CDOC* is inconsistent with both the Supreme Court's remand instructions in this case and claim exhaustion doctrine broadly; this court should therefore limit or overrule *Wellmon.* 952 F.3d 1242 (10th Cir. 2020). Most immediately, *Wellmon* cannot be reconciled with the remand instructions, which required the panel to address evidence that the panel held was beyond its reach because of *Wellmon.* App. 14, 16, 28. *Wellmon* must give way to the remand instructions.

*Wellmon*'s premise is also flawed. The question in habeas proceedings is whether an exhausted "claim" was unreasonably adjudicated. 28 U.S.C. § 2254(d). In assessing this,

---

[9] Other circuit courts also follow this rule. *See Cargle*, 317 F.3d at 1208 (collecting Fifth, Tenth, and Eleventh Circuit precedent).

courts review the arguments and facts that "relate back" to the claim adjudicated in state court. *Mayle v. Felix*, 545 U.S. 644, 650 (2005). For claims involving fundamental fairness, as here, courts must review the entire record. *Supra* III.b.ii. *Wellmon* imposes a restriction unsupported by § 2254 and contradicting *Mayle*'s framework.

The panel's *Wellmon* analysis is also factually wrong. Invoking *Wellmon*, the panel claimed Ms. Andrew did not raise much of her evidence at the OCCA. But Ms. Andrew *did* address that evidence. *Supra* III.a. Moreover, *Wellmon* itself originally limited its reach to "arguments," not record citations—making its application here a further unjustified step. 952 F.3d at 1244.

To be sure, new arguments or factual assertions can so alter a claim that it no longer relates back to the original, rendering it unexhausted. *See Fairchild*, 579 F.3d at 1152. But the arguments and assertions here were all directly before the OCCA or closely related to them. Therefore, Ms. Andrew's exhausted claim was properly before this Court, and to the extent that *Wellmon* forecloses its full adjudication, *Wellmon* should be overruled.

It bears emphasis that neither party raised *Wellmon* in remand proceedings. The panel invoked it *sua sponte* as a basis for declining to engage with the evidence the Supreme Court's remand instructions required it to address. Rehearing is required.

## IV.    CONCLUSION

The Court should grant the petition.

Respectfully submitted,

John T. Carlson
LANDY LEEDY MCGREEVY WINOCUR
303 Sixteenth Street, Suite 200
Denver, CO 80202
carlson@lmwlaw.com

/s/ John R. Mills
John R. Mills
Nathalie Greenfield
Jessica Sutton
Sarah Wishingrad
PHILLIPS BLACK, INC.
1721 Broadway, Suite 201
Oakland, CA 94612
j.mills@phillipsblack.org

19

## CERTIFICATE OF COMPLIANCE

I hereby certify that with respect to the foregoing Supplemental Brief:

(1) all required privacy redactions have been made;

(2) if required to file additional hard copies, that the ECF submission is, with the exception of any redactions, an exact copy of those hard copies;

(3) the foregoing brief and related appendices was scanned for viruses with the most recent version of a commercial virus scanning program, Avast Security, and according to the program is free of viruses; and

(4) as required by the Order filed in this case on April 14, 2026, I certify that this brief is no longer than 5,100 words and is in 13-point font. This document has been prepared in a proportionally spaced typeface using Microsoft Word.

*/s/ John R. Mills*
JOHN R. MILLS
Attorney

20

## CERTIFICATE OF SERVICE

I hereby certify that all parties to this litigation are either: (1) represented by attorneys; or (2) have consented to electronic service in this case. On April 27, 2026, I electronically filed the foregoing Petition for Rehearing and Rehearing En Banc and related Appendices using the ECF system, which will send notification of this filing to the following email address:

    Jennifer Crabb, Assistant Attorney General
    Email: Jennifer.crabb@oag.ok.gov

        Date: April 27, 2026
        */s/ John R. Mills*
        JOHN R. MILLS
        Attorney

21