# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

BRENDA EVERS ANDREW,

    Petitioner-Appellant

vs.

SCOTT TINSLEY, Warden,

    Respondent-Appellee

Case No. 15-6190

W. District of Oklahoma
D. Ct. No. 08-CV-00832-R

## BRIEF OF *AMICUS CURIAE* FAIR TRIAL ANALYSIS IN SUPPORT OF PETITIONER ANDREW'S PETITION FOR PANEL REHEARING AND REHEARING *EN BANC*

Barry C. Edwards, Esq.
1918 Lee Read, Suite B5
Orlando, FL 32810
Tel. (407) 710-2502
Email bce@uga.edu
*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

I. STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE........... 3

II. THE COURT SHOULD RECONSIDER ITS DECISION ..................................... 3

    A.   This Case Requires Analysis of Causal Relationships ........................................... 4

    B.   The Court's Analysis Is Incomplete ................................................................... 5

       1.   The Court Does Not Address the Effect of Prejudicial Evidence on the Selection Decision ................................................................................................ 6

       2.   The Court Does Not Address the Effect of Guilt-Phase Evidence on Sentencing Phase Decisions ................................................................................ 7

    C.   Normative Reasoning is Insufficient for the Required Causal Analysis ............. 8

    D.   Scientific Analysis Yields Valid and Reliable Estimates of Causal Effects .......... 9

    E.   Scientific Analysis Demonstrates that Prejudicial Evidence Had a Substantial Effect on the Selection Decision ................................................................................. 10

       1.   Effect on Perceived Value of Ms. Andrew's Life ............................................. 13

       2.   Effect on Perceptions of Cruelty ........................................................................ 14

       3.   Effect on Perceptions of Remorse ..................................................................... 15

    F.   Prejudicial Evidence Makes the Death Sentence Fundamentally Unfair ........... 16

III. CONCLUSION ..................................................................................................... 17

# TABLE OF AUTHORITIES

## Cases

*Andrew v. Tinsley*, 164 F.4th 789 (10th Cir. 2026) .................................................. 6

*Andrew v. White*, 604 U.S. 86 (2025) ..................................................................... 4

*Baze v. Rees*, 553 U.S. 35 (2008) ......................................................................... 14

*Bucklew v. Precythe*, 587 U.S. 119 (2019).......................................................... 14

*Estate of Clayton Lockett v. Fallin*, 841 F.3d 1098 (10th Cir. 2016) ................... 14

*Francis v. Resweber*, 329 U.S. 459, 464 (1947) ................................................. 14

*Glossip v. Gross*, 576 U.S. 863, 869 (2015) ........................................................ 15

*Gregg v. Georgia*, 428 U.S. 153 (1976)................................................................. 7

*Harris v. State*, 875 S.E.2d 659, 665 (Ga. 2022) ............................................... 14

*Pavatt v. Jones*, 627 F.3d 1336, 1338-39 (10th Cir. 2010)................................. 14

*Strickland v. Washington*, 466 U.S. 668, 693 (1984) ........................................... 9

## Other Authorities

Bowers, William J.; Sandys, Marla & Steiner, Benjamin D., "Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Guilt-Trial Experience, and Premature Decision Making," 83 CORNELL L. REV. 1476, 1498 (1998)......................................... 7

Edwards, Barry C., *A Scientific Framework for Analyzing the Harmfulness of Trial Errors*, 8 UCLA Crim. J. L. Rev. 1 (2024) ........................................................................ 16

Edwards, Barry C., *If the Jury Only Knew: The Effect of Omitted Mitigation Evidence on the Probability of a Death Sentence*, 32 VA. J. SOC. POL'Y & LAW 27-28 (Spring 2025) . 10, 14

Edwards, Barry C., *Measuring Fairness*, 77 Ala. L. Rev. 621 (2026)...................................... 12

Edwards, Barry C., *Oklahoma vs. Brenda Andrew Study Files*, HARVARD DATAVERSE (Apr. 22, 2025), https://doi.org/10.7910/DVN/VFEZGY................................................ 10

Eisenberg, Theodore; Garvey, Stephen P. & Wells, Martin T., Mitigation Means Having to Say You're Sorry: The Role of Remorse in Capital Sentencing, 83 Cornell L. Rev.1599, 1617 (1998) ........................................................................................ 16

Garvey, Stephen P., The Emotional Economy of Capital Sentencing, 75 N.Y.U. L. Rev. 26, 59 (2000) ......................................................................................... 15

Kaye, David & Freedman, David, "Reference Guide on Statistics," in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (Federal Judicial Center, 3d ed. 2011) .............. 9

## I. STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE

*Amicus curiae,* Fair Trial Analysis, is a nonprofit organization that uses scientific methods to quantify the unfairness of criminal trials. Its qualifications and interests have been previously submitted along with a scientific analysis of the causal effect of prejudicial evidence on the guilt and sentencing phases of the Andrew trial, which was based on a double-blind randomized experiment conducted on 1,128 jury-qualified adults representative of the trial jurisdiction. *Amicus* participates because this case requires scientific analysis of cause-effect relationships and cannot be satisfactorily resolved by legal reasoning alone. *Amicus* does not seek to prove that a trial was fair or unfair; rather, it objectively analyzes trial errors and omissions and supports outcomes consistent with sound empirical analysis. No part of this brief was written or funded by any party or party's counsel. *Amicus* files this brief by leave of court.

## II. THE COURT SHOULD RECONSIDER ITS DECISION

The core question in this case requires estimating the causal effect of prejudicial evidence with precision to decide whether it falls within acceptable bounds. It is comparable to reviewing the call made by an umpire or referee. Sometimes participants dispute whether a ball was correctly called fair or out of bounds. Disputed calls can lead to fierce arguments, but they can be resolved by identifying where balls actually land. When one can measure the quantity of interest with reasonable certainty, one can judge whether it falls within a defined boundary. This is not unproven theory. Americans see this when they watch sports. Calls made on the field are challenged, reviewed, and

3

overturned if a clear view shows the ball did not land where the umpire or referee thought it did. The important thing is to get the call right.

Did prejudicial evidence make Andrew's trial fundamentally unfair? The Court's analysis of causal effects in *Andrew v. Tinsley*, 164 F.4th 789 (10th Cir. 2026) is incomplete and incorrect. Normative reasoning cannot resolve the empirical question at the core of this case, but scientific measurement does. A double-blind, randomized experiment shows that the evidence at issue in this specific case caused $8.0 \pm 3.4$ percent of jury-qualified adults, representative of Oklahoma County, Oklahoma, to think aggravating factors outweigh mitigating factors. This translated to a $17.6 \pm 3.4$ percentage-point increase in the probability of a death sentence at Andrew's trial. The Court should decide whether the lowest plausible prejudicial effect, a 14.2 percentage-point difference, makes the sentence fundamentally unfair.

### A. This Case Requires Analysis of Causal Relationships

The U.S. Supreme Court asked this Court to consider whether the mistaken admission of prejudicial evidence caused the guilt or sentencing phases of Ms. Andrew's trial to be fundamentally unfair. *Andrew v. White*, 604 U.S. 86, 96 (2025).

The central inquiry is familiar to researchers across many domains: Does a causal variable substantially affect observable outcomes in a defined population? Scientific methods, including causal diagrams, facilitate this analysis. Prejudicial evidence improperly admitted at trial (node X) may affect the trial outcome (node O) by

influencing guilt, eligibility, and selection decisions (nodes G, E, and S, respectively) made by a representative cross-section of the trial jurisdiction.



**Figure 1. Diagram of Causal Relationships to Evaluate**

Causal analysis requires evaluating the three potential causal paths labeled with question marks. The answer to the core question—How did prejudicial evidence affect Ms. Andrew's trial?—is a number, a quantifiable effect on trial outcome probabilities. If someone is unable to answer this question with a number, that person is not obtuse or dishonest; that person simply lacks appropriate tools for answering the question. The effect of X on O is an empirical question solved by scientific measurement.

## B. The Court's Analysis Is Incomplete

The Court makes two findings relevant to the causal analysis. First, evidentiary errors did not substantially affect the guilt decision. *Andrew v. Tinsley*, 164 F.4th 789,

796-802 (10th Cir. 2026). Second, evidentiary errors in the sentencing phase did not substantially affect the finding of aggravating factors. *Id.* at 803-04.

The Court's findings are correct. Prejudicial evidence did not substantially increase the probability of a guilty verdict. Likewise, prejudicial evidence did not affect the jury's finding that at least one aggravating factor exists to make Andrew eligible for a death sentence.[1] However, the Court's analysis is incomplete and does not support its overall assessment of the trial.

### 1. The Court Does Not Address the Effect of Prejudicial Evidence on the Selection Decision

After an Oklahoma jury finds that a defendant is eligible for a death sentence, it must then decide whether aggravating factors outweigh mitigating factors. The selection decision (S) is a fundamentally different inquiry than the eligibility decision (E). The question is not whether facts have been proven but rather whether to spare a life. It is an emotional, gut-wrenching decision entrusted to jurors who represent the conscience of the community. If judges could make the selection decision by applying logical rules and standards, sentencing juries would be unnecessary.

While the Court evaluates the X→G and X→E relationships in Figure 1, it does not address the effect of prejudicial evidence on the jury's selection decision (the X→S

---

[1] As the Court finds, the prejudicial evidence has no plausible bearing on the finding that the killing was for remuneration. As discussed below, it may affect the "especially heinous, atrocious, or cruel" aggravating factor, but eligibility is the same with one or two aggravating factors.

relationship). The necessary causal analysis is incomplete, and this oversight leads to incorrect conclusions.

### 2.  The Court Does Not Address the Effect of Guilt-Phase Evidence on Sentencing Phase Decisions

The panel's evaluation of the effect of prejudicial evidence on the sentencing phase is confined to one item introduced in the sentencing phase.[2] The Court's analysis is incomplete because prejudicial evidence introduced during the guilt phase may affect jury decisions in the sentencing phase. "Evidence considered during the guilt stage may be considered during the sentencing stage without being resubmitted." *Gregg v. Georgia*, 428 U.S. 153, 164 (1976). The Court's appraisal of the X→E relationship is still correct, but it should avoid repeating this mistake when evaluating X→S.

Death penalty jurors develop sentencing preferences during the guilt phase based primarily on their impressions of the defendant and the manner of death.[3] In Andrew's sentencing, the prosecution relied on evidence introduced during the guilt phase, including evidence of remuneration and painful death, to establish aggravating factors. To evaluate X's effect, the Court must fully evaluate X, not redefine X to make the core question simpler or easier to answer.

---

[2] For guilt-phase analysis, one may disregard prejudicial evidence introduced in the sentencing phase because causes must precede effects.

[3] *See*, *e.g.*, William J. Bowers, Marla Sandys & Benjamin D. Steiner, "Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Guilt-Trial Experience, and Premature Decision Making," 83 CORNELL L. REV. 1476, 1498 (1998).

**C. Normative Reasoning is Insufficient for the Required Causal Analysis**

Having identified gaps in its analysis, the Court could simply amend its earlier opinion to say it has also considered the selection decision and does not think prejudicial evidence affected it. There are reasons to think aggravating factors should outweigh mitigating factors in the minds of rational jurors. Reasoning is useful for developing theories and opinions, but it does not yield satisfactory answers to the causal questions. If normative reasoning were sufficient, it would yield precise estimates and show that the change in trial outcome probabilities falls within acceptable limits.

Reasoned estimates of causal effects tend to be imprecise, inaccurate, and vulnerable to biases and heuristics. The reasoner may know how the causal variable affects him, but he cannot read others' minds to know how many share his thoughts. Attorneys and judges face additional challenges. They do not represent distinct demographic features of the population; they are trained to think differently; they have taken positions and seek confirmation.

Reasonable people, currently one-third of a representative sample, believe the uncontested facts, without prejudicial evidence, justify the death penalty. But there are other opinions in the population. Precise analysis requires understanding the relative prevalence of opinions and how prejudicial evidence affects the balance between them. Reasoning allows us to recognize that prejudicial evidence has some effect, but it does

not enable us to measure that effect with enough precision to determine whether it falls within certain bounds.[4]

### D. Scientific Analysis Yields Valid and Reliable Estimates of Causal Effects

Our understanding of how stimuli, including evidence and messages, causally affect people's beliefs and attitudes has evolved from normative, model-driven thinking to rigorous experimental science. Modern scholars rely on scientific methods to estimate the *actual* effects of causal variables on attitudes, beliefs, and judgments.

"Randomized controlled experiments are ideally suited for demonstrating causation." David Kaye & David Freedman, "Reference Guide on Statistics," in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 218 (Federal Judicial Center, 3d ed. 2011). Randomized experiments are used to study educational practices, therapies, marketing campaigns, public health policies, and more. "If subjects are assigned to treatment and control groups at random, a difference in the outcomes between the two groups can usually be accepted, within the limits of statistical error, as a good measure of the treatment effect." *Id.*, at 220.

Scientific analysis of jurors and juries is widely accepted, as evident in the widespread use of mock juries, focus groups, and analysis of juror questionnaires. The tools used by *Amicus*—written vignettes, random assignments, survey questions, and

---

[4] As the Supreme Court observed, "Virtually every act or omission" has "some conceivable effect on the outcome of the proceeding." *Strickland v. Washington*, 466 U.S. 668, 693 (1984). Prejudicial evidence is, by definition, prejudicial to the defendant.

statistical tests—are all well established. From sample data, a researcher can estimate verdict and sentencing preferences in the population.[5] Scientific analysis not only quantifies causal effects, it also reports margins of error and shows how the results were obtained so others may check the work. The survey instrument, respondent data, survey responses, and analysis code have all been made available.[6] Reasoning only generates beliefs that cannot be verified, tested, or scrutinized.

Scientific analysis does not challenge the legal standard; it operationalizes the core inquiry so governing rules may be applied objectively. Here, scientific analysis confirms that the Court correctly evaluated two causal paths but identified a path that was not evaluated ($X \rightarrow S \rightarrow O$ in Figure 1). The neglected path is significant, and the Court's overall assessment of the effect of prejudicial evidence on the trial is incorrect.

### E. Scientific Analysis Demonstrates that Prejudicial Evidence Had a Substantial Effect on the Selection Decision

A double-blind randomized experiment quantifies the treatment effects among jury-eligible adults representative of the trial jurisdiction. Respondents read case summaries and indicate how they would decide on guilt and sentencing. The case

---

[5] *See* Barry C. Edwards, *If the Jury Only Knew: The Effect of Omitted Mitigation Evidence on the Probability of a Death Sentence*, 32 VA. J. SOC. POL'Y & LAW 1, 27-28 (Spring 2025).

[6] *See* Barry C. Edwards, *Oklahoma vs. Brenda Andrew Study Files*, HARVARD DATAVERSE (Apr. 22, 2025), https://doi.org/10.7910/DVN/VFEZGY.

description tracks the Court's summary of facts. Consider, for example, the description of Andrew's flight and arrest:

> **Court:** Appellant did not attend her husband's funeral, choosing instead, to go to Mexico with Pavatt and the children. Pavatt called his daughter several times from Mexico and asked her to send them money. Larson cooperated with the FBI and local authorities in trying to track down the pair.

> **Study:** The defendant did not attend her husband's funeral. Instead, she took the children and fled to Mexico with the insurance agent. {The defendant packed thong underwear for the trip.} The insurance agent's daughter helped authorities track down the pair.

The treatment group reads a summary that includes the improper items enumerated by Judge Bacharach.[7] *Andrew v. White*, 62 F.4th 1289, 1356-57 (10th Cir. 2023) (Bacharach, J., dissenting) (identifying nine categories of improper evidence that "the State doesn't try to defend"). For example, the treatment group reads, "The defendant packed thong underwear for the trip." The control group reads the summary without prejudicial items.

Respondents in both conditions were asked whether they would find the defendant guilty of murder. Respondents were then asked to assume the defendant was

---

[7] The parties' recent filings appear to dispute the enumeration of prejudicial items under consideration (node X). Any enumeration of prejudicial items can be analyzed but is not feasible to evaluate all possible permutations of X in one study. Collecting data is like baking; you can choose your ingredients at the start, but you cannot change the recipe after it is baked.

11

found guilty and to decide whether aggravators outweigh mitigators.[8] Prejudicial evidence admitted in this case increased support for the death penalty among jury-qualified adults by 8.0 ± 3.4 percentage points. It is estimated that prejudicial evidence increased support for a death sentence in the jury pool from 55.1% to 63.1%.

The causal effect of prejudicial evidence on the selection decision is magnified by the deliberation process.[9] When verdict factions have comparable numbers, one juror switching sides has a much larger effect than if the vote is lopsided. Prejudicial evidence increased the probability that Ms. Andrew would be sentenced to death at her 2004 trial by 17.6 ± 3.4 percentage points (from 46.4 to 64.0 percent).

**Table 2: Effect of the Prejudicial Evidence on Probability of a Death Sentence**

|  | Treatment Condition | Control Condition | Causal Effect |
|---|---|---|---|
| Support for death sentence | 63.1% | 55.1% | +8.0% |
| Probability of death sentence | 64.0% | 46.4% | +17.6% |

Cumulative effects are possible because guilt, eligibility, and selection decisions all affect the outcome. In this case, however, prejudicial evidence has minimal effect on

---

[8] The survey does not ask specifically whether respondents think at least one aggravating factor is present, but simply whether they think aggravating factors outweigh mitigating factors.

[9] Research has identified the relationship between population preferences, initial jury votes, and deliberated verdict probabilities to enable analysts to estimate the effect of trial errors and omissions on verdict probabilities using sample data obtained from individuals. *See* Edwards, Barry C., *Measuring Fairness*, 77 Ala. L. Rev. 621 (2026).

the guilt decision and no bearing on eligibility. The cumulative effect of prejudicial evidence is not significantly different from its effect on the selection decision.

The same evidentiary errors would have less effect today because contemporary juries are unlikely to impose a death sentence in this case with or without the disputed evidence.[10] If Andrew were resentenced today without prejudicial evidence, the probability of a death sentence would be only 11.2%. This dramatic difference comes more from the passage of time than from prejudicial evidence per se, but it underscores that resentencing would not be a futile exercise destined to yield the same result.

Comments volunteered by survey respondents, included in online replication materials, help us understand why prejudicial evidence changes minds. Evidentiary errors add weight to aggravating factors and reduce the weight of mitigating factors.

### 1. Effect on Perceived Value of Ms. Andrew's Life

Prejudicial evidence affects whether people think Ms. Andrew's life should be spared. For some, prejudicial evidence evokes feelings of disgust and disdain; the defendant does not deserve mercy; her life does not have redeeming value to her

---

[10] In 2004, approximately 85% of Oklahomans favored capital punishment for murder, compared to roughly 65% today. Oklahoma is more pro-death penalty than the nation as a whole, but shows similar trends in public opinion.

children, who would be better off without her.[11] Respondents in the control group are more likely to perceive redeeming value for the children.[12]

### 2. Effect on Perceptions of Cruelty

Prejudicial evidence affects whether respondents think the killing was cruel. Here, nonprejudicial evidence shows that Mr. Andrew suffered a painful death, which supports the aggravator, but the extent of cruelty depends on the killer's intention to cause pain. This Court and others have consistently recognized that an intentional killing is not cruel simply because the deceased experiences pain, whether by accident or as "an inescapable consequence of death." *Baze v. Rees*, 553 U.S. 35, 50 (2008); *Pavatt v. Jones*, 627 F.3d 1336, 1338-39 (10th Cir. 2010); *Estate of Clayton Lockett v. Fallin*, 841 F.3d 1098, 1109-10 (10th Cir. 2016). A painful killing is cruel if the executioner intentionally causes unnecessary pain by "superadding" terror, pain, or disgrace. *See Bucklew v. Precythe*, 587 U.S. 119, 133 (2019); *Francis v. Resweber*, 329 U.S. 459, 464 (1947).

---

[11] The trial of Justin Harris in Georgia offers an interesting comparison with gender roles reversed. Prosecutors alleged that Harris intentionally left his infant son to die inside a hot car so he could freely pursue extramarital affairs. Similar to the Andrew trial, the state did more than prove that Harris had affairs; it showed the jury graphic messages and intimate photos that Harris sent women, which created the impression that Harris was "a philanderer, a pervert, and even a sexual predator." *Harris v. State*, 875 S.E.2d 659, 665 (Ga. 2022). The Georgia Supreme Court reversed Harris's conviction because graphic details of Harris's affairs caused substantial prejudice.

[12] Research shows that humanizing narratives are effective for mitigation purposes; they suggest that the defendant has tragic flaws but is not fundamentally evil. *See* Edwards, *If the Jury Only Knew*, *supra*, at 6 n. 18-19.

Holding that pain alone proves cruelty "would effectively outlaw the death penalty altogether." *Glossip v. Gross*, 576 U.S. 863, 869 (2015).

Some people exposed to prejudicial evidence perceived the killing as a culmination of Ms. Andrew's efforts to humiliate, emasculate, and manipulate her husband to cause him suffering during their marriage. Respondents in the control group were more likely to think that Ms. Andrew's motives were selfish, rather than that her intent was to cause a painful death. Without the sordid backstory, the killing appears relatively clinical.[13] The killers did not superadd pain and suffering through sexual assault, mutilation, torture, or denying proper burial. Like a botched execution, the first shot was not fatal, so there was a second shot. For some, perceived cruel intentions swing the balance of aggravating and mitigating factors in favor of a death sentence.

### 3. Effect on Perceptions of Remorse

Among other evidentiary errors, the trial court improperly excluded testimony from the first responding officer, who would have testified that Ms. Andrew was distraught and emotional. The first responder's testimony would contradict admitted testimony that Ms. Andrew was "emotionless" and "indifferent." The first responder's testimony affects whether some respondents believe Andrew felt some anguish and remorse about killing her husband. Expressions of remorse and appropriate emotional responses are known to be mitigating factors.[14]

---

[13] Most men who commit suicide choose firearms.

[14] Stephen P. Garvey, The Emotional Economy of Capital Sentencing, 75 N.Y.U. L. Rev. 26, 59 (2000); Theodore Eisenberg, Stephen P. Garvey & Martin T. Wells,

### F. Prejudicial Evidence Makes the Death Sentence Fundamentally Unfair

Ultimately, this case calls for a determination whether a measurable quantity falls within certain bounds. The best causal analysis available shows that prejudicial evidence increased the probability that Ms. Andrew would be sentenced to death by $17.6 \pm 3.4$ percentage points. A fairminded person, applying the margin of error in favor of prior state court decisions, would say the effect on sentencing could be as low as 14.2 percentage points, but not lower.

Ultimately, deciding whether a prejudicial effect that could be as low as 14.2 percentage points is fundamentally unfair is a normative question for courts, not an empirical question addressed with data analysis. The specific threshold is somewhat arbitrary; there simply needs to be a meaningful standard for judgment. The suggested threshold is 10 percentage points in most cases, with a lower threshold, perhaps 5 percentage points, in capital cases due to the finality of death.[15] These candidate values are based on the levels of uncertainty that undermine public confidence, conventional hypothesis testing standards, and what may be inferred by measuring effects in landmark cases. The effects that courts find tolerable measure less than 10 percentage

---

Mitigation Means Having to Say You're Sorry: The Role of Remorse in Capital Sentencing, 83 Cornell L. Rev.1599, 1617 (1998).

[15] *See* Edwards, Barry C., *A Scientific Framework for Analyzing the Harmfulness of Trial Errors*, 8 UCLA Crim. J. L. Rev. 1 (2024). Specifying the specific value of terms used in the legal standard is not like quantifying reasonable doubt in jury instructions where it may cause confusion. The "fundamental fairness" standard is used by judges, not jurors.

points, whereas defendants and petitioners prevail in cases where the measured effect is greater than 10 percentage points.

The fundamental question posed here—Was Andrew's trial fundamentally fair?—is best answered by measuring the causal effect of prejudicial evidence on the trial outcome and deciding whether it falls within defined limits. Federal courts should give due respect to decisions made by state courts, but on careful review, it becomes clear that some of those decisions were wrong, including one here, and should be corrected.

### III. CONCLUSION

This Court should reconsider its January 13, 2026 opinion. The Court correctly evaluated two causal paths but overlooked the third path, which led to an incorrect answer to the main question. Improper evidence did not make the guilt phase or eligibility decision fundamentally unfair but did compromise the selection decision by affecting the relative weight of aggravating and mitigating factors. *Amicus* prays that the Court will reconsider its opinion, recognize the causal effect of prejudicial evidence on the selection decision, and order a new sentencing proceeding.

Respectfully submitted, this 21st day of May, 2026.

**/s/ Barry C. Edwards**
Barry C. Edwards, Esq.
1918 Lee Read, Suite B5
Orlando, FL 32810
Tel. (407) 710-2502
Email bce@uga.edu

17

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing **BRIEF OF *AMICUS CURIAE* FAIR TRIAL ANALYSIS IN SUPPORT OF PETITIONER ANDREW'S PETITION FOR PANEL REHEARING AND REHEARING *EN BANC*** complies with the page length limitation set forth in Fed. R. App. P. 29(a)(5). It is 15 pages (not including the table of contents and table of authorities), one-half the maximum length authorized for a party's principal brief. It uses proportionally spaced 14-point font. All required privacy redactions have been made. ECF submissions have been scanned for viruses with the most recent version of commercial virus-scanning software and are virus-free.

This 21st day of May, 2026.

**/s/ Barry C. Edwards**
Barry C. Edwards, Esq.
1918 Lee Read, Suite B5
Orlando, FL 32810
Tel. (407) 710-2502
Email: bce@uga.edu

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **BRIEF OF *AMICUS CURIAE* FAIR TRIAL ANALYSIS IN SUPPORT OF PETITIONER ANDREW'S PETITION FOR PANEL REHEARING AND REHEARING *EN BANC*** using the CM/ECF system, thereby causing it to be electronically transmitted to counsel for all parties of record.

This 21st day of May, 2026.

**/s/ Barry C. Edwards**
Barry C. Edwards, Esq.
1918 Lee Read, Suite B5
Orlando, FL 32810
Tel. (407) 710-2502
Email: bce@uga.edu

19